STATE OF NORTH CAROLINA v. DARREN WILLIAM DENNISON, Defendant

No. COA02-1512

(Filed 6 April 2004)

**1. Appeal and Error— preservation of issues—introduction of character evidence**

Defendant preserved an evidence issue for appeal where his pre-trial motion in limine was granted; he objected at trial when the prosecutor raised the subject on cross-examination; the basis of his assignment of error was the same as the argument at trial; he moved that the testimony be stricken; and he moved for a mistrial.

**2. Evidence— prior acts of violence—door not opened by defense**

Testimony about unrelated prior acts of violence against a former girlfriend was erroneously admitted and prejudicial in defendant's prosecution for first-degree murder in a bar fight. The defense's testimony was limited to defendant's actions and state of mind on the night in question and did not open the door, nor did testimony that defendant was not the initial aggressor in the bar fight. Testimony elicited by the State on cross-examination does not open the door because it is not testimony offered by the defendant. Finally, there was prejudice in the incendiary nature of the evidence and the emphasis it received.

Judge TIMMONS-GOODSON dissenting.

Appeal by defendant from judgment entered 20 May 2002 by Judge A. Moses Massey in Guilford County Superior Court. Heard in the Court of Appeals 10 September 2003.

*Attorney General Roy Cooper, by Special Deputy Attorney General Steven M. Arbogast, for the State.*

*Daniel Shatz for defendant-appellant.*

ELMORE, Judge.

Darren William Dennison (defendant) appeals from judgment entered 20 May 2002 consistent with a jury verdict finding him guilty of the first degree murder of Chad Everette Spaul (Mr. Spaul), and the trial court's subsequent imposition of a sentence of life imprisonment

without parole. The underlying facts tend to show that Mr. Spaul died from knife wounds inflicted by defendant during an altercation between defendant and Mr. Spaul outside a bar. Because we conclude that on the facts of this case defendant's right to a fair trial was unfairly prejudiced by the admission of evidence regarding prior acts of violence allegedly perpetrated by defendant upon his former girlfriend, we reverse defendant's conviction and remand for a new trial.

The evidence presented at trial tended to show that on the evening of 21 September 2001, defendant, defendant's girlfriend Melanie Gammons, and Charlene Waller traveled together to the Challenger Sports Bar in High Point, North Carolina. Among those also present at the crowded bar that evening were Delores Vail and her sister Diane Lovern; Lovern's daughter Tracy Boone and Boone's boyfriend, Jeff Peele; and Mr. Spaul and Mr. Spaul's coworker, David Moore.

Waller testified that after she, defendant, and Gammons played two games of a NASCAR-themed board game popular with the bar's patrons, they stepped outside along with Vail, and that Moore, whom she did not know, then approached the group and "got in [her] face." Waller briefly went back inside the bar with Vail, only to re-emerge after Moore followed them inside. Waller testified that when she and Vail exited the bar the second time, they went around to the side of the building, where they encountered Michael Crane, and that they were soon joined there by defendant, Gammons, and Moore. Several witnesses testified that Moore had been trying unsuccessfully throughout the evening to speak with Vail, with whom he had been romantically involved several years earlier, and Waller testified that Moore was continuing to do so at this point.

According to the testimony of various witnesses, Mr. Spaul then came outside the bar and approached the group, just as a visibly upset Moore was walking away, and Mr. Spaul and Moore spoke briefly outside the hearing of the others before Moore re-entered the bar. Lovern, who had by this time stepped outside the bar, testified that Mr. Spaul then began "arguing and carrying on with . . . mostly [Gammons] and [Waller] . . . but he was trying to start with [defendant]." Waller and Lovern each testified that Mr. Spaul then began calling defendant "faggot," "fag," and "queer." At that point, defendant, Gammons, Waller, and Crane walked back around to the front of the building in an attempt to get away from Mr. Spaul, who followed the group and continued to call defendant names. The

STATE v. DENNISON

[163 N.C. App. 375 (2004)]

group moved three or four times to various locations around the building in an effort to defuse the situation, but Mr. Spaul continued to follow the group and continued to behave belligerently towards defendant. Lovern, Moore, and the bar's owner each tried, to no avail, to get Mr. Spaul to desist.

According to Waller, Mr. Spaul then briefly re-entered the bar, but shortly thereafter he emerged with a bottle of beer and resumed calling defendant a "faggot." Mr. Spaul exchanged words with Waller and Gammons and then stated that he was going to hit Crane, who was standing next to defendant. According to the testimony of Waller, Lovern, and Peele, each of whom witnessed this portion of the fatal confrontation between defendant and Mr. Spaul, Mr. Spaul first struck Crane, and then defendant, in rapid succession with his fist, causing Crane to fall to the ground and defendant to be knocked down and against a post. Waller testified that after Mr. Spaul hit Crane and defendant, she ran into the bar to get help. Lovern testified that when "[defendant] got up, he went to swinging" at Mr. Spaul, at which point she "was pushed out of the way, and that's all [she] saw" until she turned back around and saw Mr. Spaul on the ground "and a lot of blood." Lovern's testimony was generally corroborated by that of Peele. Defendant was six feet, two inches tall and weighed approximately 215 pounds at the time, while Mr. Spaul was five feet, eleven inches tall and weighed approximately 165 pounds. Both defendant and Mr. Spaul had been drinking before the altercation.

Dr. Thomas Clark, the forensic pathologist who performed Mr. Spaul's autopsy, testified that Mr. Spaul suffered eight sharp-force injuries inflicted with a knife. The most significant wound went "across the middle of the body and the right side of the neck . . . [and] cut both of the carotid arteries," which, in Dr. Clark's opinion, caused Mr. Spaul to bleed to death. None of the other seven wounds were as significant, and several were described as "superficial" by Dr. Clark. In Dr. Clark's opinion, all of Mr. Spaul's injuries could not have been inflicted by a single swing of a knife, although some of the wounds were on a linear track.

Defendant testified at trial and admitted cutting Mr. Spaul with a knife he regularly carried, but only after Mr. Spaul repeatedly called defendant names, followed defendant around outside the bar when defendant tried to avoid confrontation, and eventually struck defendant in the head. Defendant testified he "believe[d he] was hit with a beer bottle," but neither defendant nor any other witness testified that they actually saw Mr. Spaul wield a beer bottle when he struck

STATE v. DENNISON

[163 N.C. App. 375 (2004)]

defendant. Defendant testified that as Mr. Spaul was attempting to strike him a second time, defendant pulled his knife out of his pocket and pushed upward with the knife, cutting Mr. Spaul. Defendant testified that he "did not mean to kill [Mr. Spaul]," but rather that he "meant . . . to cut [Mr. Spaul] to get him off of me."

Defendant, Gammons, and Waller then got in Waller's car and left the scene. Defendant testified that he left because he was scared of Moore, who upon seeing Mr. Spaul prone and bleeding profusely threatened to kill defendant, and beat on Waller's car as the car pulled out of the parking lot. Defendant, Gammons, and Waller proceeded to Waller's home, where defendant showered and changed his clothes, which were stained with Mr. Spaul's blood. Defendant testified that because he feared the police would find him at Waller's house, the group was then driven to a motel by a third person, at which point defendant telephoned the bar and was informed that Mr. Spaul was dead. After contacting the High Point police department, defendant turned himself in at 5:00 p.m. the following afternoon.

On cross examination at trial, the following exchange took place, with no objection from defendant:

Q. Mr. Dennison, do you consider yourself to be even-tempered?

A. Yes.

Q. You don't consider yourself to be hot-tempered?

. . . .

A. As to me, hot-tempered means extremely hot.

Q. So the answer to that is yes or no?

A. No.

Q. Do you get easily agitated, Mr. Dennison?

A. Not easily agitated[.]

. . . .

Q. Do you consider yourself to be a person of violence?

A. No.

. . . .

Thereafter, over defendant's objection, the prosecutor was allowed to question defendant about acts of violence allegedly perpe-

trated by defendant upon his ex-girlfriend Melanie Tellado in 2001. Defendant admitted being "mad at [Tellado] because she was screwing around on me" and acknowledged arguing and fighting with Tellado at times. Defendant specifically denied punching out the right driver's side window of Tellado's car and striking her in the head in March 2001, although he testified that Tellado sought medical attention that night for cuts suffered when she tried to roll up her car window on his hand and the glass shattered. Defendant also denied attacking Tellado with a knife or holding her at knifepoint in her apartment in January 2001, although he admitted kicking in the door to her apartment on one occasion around that time and being present in her apartment when Tellado called the police on another occasion.

In its case in rebuttal, the State called Tellado, who testified that on three occasions she sought medical attention as a result of being hit by defendant. Tellado testified that on one such occasion, defendant hit her, and that "[w]hen [the police] came to the door, [defendant] put a knife to [her] throat and told [her] that if [she] told them that he was there, that he would kill [her]." According to Tellado, the knife defendant put to her throat on that occasion was the same knife defendant used to kill Mr. Spaul. Tellado testified that on another occasion she sought treatment for cuts and scratches to her face suffered when defendant shattered her car window, reached inside, and grabbed her around the neck. Finally, Tellado testified that defendant once kicked down the door to her apartment after becoming angry at her for leaving town. The trial court denied defendant's motion to strike Tellado's testimony.

Defendant moved to dismiss the charges against him at the close of the State's evidence and again at the close of all evidence; each motion was denied. Prior to the jury charge, defendant moved for a mistrial based on the improper admission of evidence concerning defendant's character, which motion was also denied. The jury subsequently returned a verdict finding defendant guilty of first-degree murder, and the trial court sentenced defendant to life imprisonment.

On appeal, defendant contends the trial court committed prejudicial error by allowing the State to present evidence of defendant's alleged prior acts of violence towards Tellado, his former girlfriend, arguing that such testimony constituted inadmissible character evidence under Rules 404 and 405(b) of our statutes. We agree.

[1] First, we note that defendant has properly preserved this issue for appellate review. The trial court granted a pre-trial motion *in lim-*

*ine* filed by defendant's trial counsel, which precluded the State from presenting evidence concerning defendant's alleged acts of violence towards Tellado during its case in chief. Moreover, defendant's trial counsel interposed a timely objection as soon as the prosecutor, on cross examination, began to question defendant about his alleged conduct regarding Tellado. Defendant's trial counsel thereafter argued vigorously that this evidence should be excluded, on the same grounds defendant's appellate counsel now cites as the basis for this assignment of error. While defendant's trial counsel did not initially object to Tellado's direct testimony, at the conclusion of her testimony he moved to strike her entire testimony as impermissible character evidence. Finally, defendant's trial counsel moved for a mistrial based on the admission of the evidence which is the basis of this assignment of error. Based on the foregoing, we conclude that this issue has been properly preserved for appellate review. *See* N.C.R. App. P. 10(b)(1) (2004) ("Any such question which was properly preserved for review by action of counsel taken during the course of proceedings in the trial tribunal . . . may be made the basis of an assignment of error in the record on appeal.")

**[2]** Regarding the admissibility of character evidence, Rule 404(a) provides as follows:

(a) *Character evidence generally.*—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) *Character of accused.*—Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

. . . .

N.C. Gen. Stat. § 8C-1, Rule 404(a) (2003). "Such character evidence is admissible when the *defendant* has first 'opened the door' to a pertinent trait of his character." *State v. Stafford,* 150 N.C. App. 566, 571, 564 S.E.2d 60, 63 (2002), *cert. denied,* 357 N.C. 169, 581 S.E.2d 444 (2003) (emphasis added).

In the case *sub judice,* the State contends that defendant "opened the door" to admission of evidence regarding his character for violence "by the manner that he sought to portray himself during the defense case." Specifically, the State asserts that testimony by defendant and his witnesses tending to portray defendant as "calm,

level-headed, and doing everything he could to avoid a confrontation" with Mr. Spaul on the night in question constituted evidence of a pertinent trait of defendant's character, offered by *defendant*, which the State was authorized under Rule 404(a)(1) to rebut by presenting evidence of defendant's allegedly violent character.

After carefully reviewing the trial transcript, other record evidence, and arguments of the parties, we conclude that the evidence regarding defendant's alleged prior violent acts against his former girlfriend was not properly admitted under Rule 404(a). As noted above, Rule 404(a)(1) permits the prosecution to present evidence concerning the defendant's character only *after* the defendant has first interjected his character into the proceedings by offering his own evidence tending to show defendant possesses a certain character trait. N.C. Gen. Stat. § 8C-1, Rule 404(a)(1); *Stafford*, 150 N.C. App. at 571, 564 S.E.2d at 63. In the present case, the testimony of defendant and the several other defense witnesses was strictly limited to defendant's actions and state of mind *on the night in question*. While much of this testimony focused on defendant's initial unwillingness to respond belligerently to Mr. Spaul's taunts and defendant's attempts to avoid a confrontation with Mr. Spaul by repeatedly walking away, we do not find any instance where defendant interjected his character into the proceedings by proffering testimony tending to show he possessed a generally peaceful or non-violent disposition. To the contrary, before introducing into evidence Waller's statement to the police, defendant's trial counsel carefully redacted the statement to remove all references to defendant's general character traits.

We find unpersuasive the State's argument that by presenting testimony tending to show that defendant was not the initial aggressor in his confrontation with Mr. Spaul, defendant "opened the door" under Rule 404(a) for the prosecution to offer evidence of defendant's violent character. *See State v. Roseboro*, 351 N.C. 536, 553, 528 S.E.2d 1, 12 (2000) ("[d]efendant placed his character at issue by having members of his family testify about his reputation for nonviolence or peacefulness.") We also conclude that while defendant, on cross examination, answered in the negative the prosecutor's queries as to whether defendant considered himself to be "hot-tempered," "easily agitated," or "a person of violence," this testimony did not suffice to interject defendant's character into the trial proceedings. Because defendant's testimony in this regard was elicited by the State, we hold that it was not character evidence "offered by an accused" such that it would "open the door" under Rule 404(a)(1) for the State to intro-

duce its own character evidence in rebuttal. N.C. Gen. Stat. § 8C-1, Rule 404(a)(1); *State v. Gappins*, 320 N.C. 64, 70, 357 S.E.2d 654, 658 (1987) ("In the present case, the defendant put his character in issue by having witnesses testify concerning his reputation for peaceful-ness . . . . Only then did the prosecutor . . . cross examine the wit-nesses about specific instances of conduct by the defendant, in an effort to rebut their prior testimony as to the defendant's character for peacefulness.")

Nor are we persuaded by the State's argument that evidence regarding defendant's alleged prior acts of violence towards his for-mer girlfriend was properly admitted under Rule 404(b), which pro-vides as follows:

(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a per-son in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, iden-tity, or absence of mistake, entrapment or accident. . . .

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2003). We do not discern suffi-cient similarities in the circumstances surrounding Mr. Spaul's death and those surrounding defendant's violent acts allegedly directed towards Tellado to render evidence regarding the latter admissible for any purpose sanctioned by Rule 404(b).

Finally, we do not agree with the State's assertion that this evi-dence was properly admitted under Rule 405(b), which provides that "[i]n cases in which character or a trait of character or a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct." N.C. Gen. Stat. § 8C-1, Rule 405(b) (2003). Defendant maintained at trial that he used a knife in striking Mr. Spaul because he felt it was necessary to do so in order to defend himself from Mr. Spaul, whom defendant testified he believed had just struck him in the head with a beer bottle. In *State v. Morgan*, 315 N.C. 626, 340 S.E.2d 84 (1986), our Supreme Court found error in the admission of testimony regarding a first-degree murder defendant's prior assaultive behavior towards a person other than the victim where the defendant claimed he acted in self-defense, stat-ing as follows:

The proper inquiry in a self-defense claim focuses on the reason-ableness of defendant's belief as to the apparent necessity for,

and reasonableness of, the force used to repel an attack upon his person. The fact that defendant may have pointed a gun at another person sometime in the past, without more, has no tendency to show that the defendant did not fear [the victim] or to make the existence of his belief as to the apparent necessity to defend himself from an attack "more or less probable than it would be without the evidence."

*Morgan*, 315 N.C. at 639, 340 S.E.2d at 92; *accord, State v. Mills*, 83 N.C. App. 606, 351 S.E.2d 130 (1986). We therefore conclude that since raising a self-defense claim does not interject a defendant's character into the proceedings, and a defendant's character is not an essential element of a self-defense claim, admission of the challenged evidence in the instant case was not justified under Rule 405(b).

Having concluded that the trial court erred by admitting evidence of defendant's alleged violent acts towards Tellado, we must now determine whether defendant was prejudiced by the error. A non-constitutional error is deemed prejudicial "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." *State v. Maske*, 358 N.C. 40, 50, 591 S.E.2d 521, 528 (2004) (quoting N.C. Gen. Stat. § 15A-1443(a) (2003)).

In the present case, the State elicited testimony concerning defendant's violent acts toward Tellado both by questioning defendant about them on cross examination, and by calling Tellado as a rebuttal witness. Tellado testified that on three separate occasions during and immediately after their six-month courtship, defendant damaged both her car and her home and struck her with sufficient force that she had to go to the hospital. The prosecutor referred to defendant's prior bad acts regarding Tellado three times in his closing argument, including one occasion where he stated "You saw how [defendant] acted with Melanie Tellado in their relationship." We conclude that on these facts, as in *State v. Mills*, 83 N.C. App. 606, 351 S.E.2d 130 (1986), "[d]ue to the incendiary nature of the evidence improperly admitted, and the emphasis placed on that evidence at trial, we find that its admission was prejudicial error requiring a new trial."

Because we hold that, on these facts, the admission of evidence of defendant's violent acts toward his former girlfriend was prejudicial error requiring a new trial, we need not address defendant's remaining assignments of error.

New trial.

Judge HUDSON concurs.

Judge TIMMONS-GOODSON dissents.

TIMMONS-GOODSON, Judge, dissenting.

Because I conclude that the trial court did not err in allowing the prosecution to cross-examine defendant with specific bad acts and elicit testimony from defendant's former girlfriend, I respectfully dissent.

"A criminal defendant is entitled to introduce evidence of his good character [on direct], thereby placing his character at issue. The State in rebuttal can then introduce evidence of defendant's bad character." *State v. Roseboro*, 351 N.C. 536, 553, 528 S.E.2d 1, 12, *cert. denied*, 531 U.S. 1019 (2000). As the Court stated in *State v. Gappins*, 320 N.C. 64, 69-70, 357 S.E.2d 654, 658 (1987), Rule 404(a)(1) limits the admission of character evidence introduced on direct to "pertinent traits" of character. However, in contrast to the common law, Rule 405(a) specifically allows the prosecutor to cross-examine a witness concerning relevant and specific instances of the defendant's conduct when rebutting character evidence. *Id.* at 70, 357 S.E.2d at 658.

In *Gappins*, the Court concluded that the defendant's "reputation for peacefulness" was "a pertinent trait of his character" in a murder trial. *Id.* After "character witnesses testified concerning the defendant's reputation for peacefulness, the prosecutor asked the witnesses on cross examination whether they had heard or knew about certain instances including acts of domestic cruelty and rowdy and abusive conduct by the defendant when he was drinking." *Id.* at 69, 357 S.E.2d at 658. The Court held that these questions were permissible under the Rules of Evidence. *Id.*

Similarly, in *State v. Garner*, 330 N.C. 273, 289-90, 410 S.E.2d 861, 870 (1991), the defendant "put his character into evidence" by "paint[ing] a picture of himself as a level-headed, peaceful individual who constantly was fending off verbal and physical attacks from the victim." The Court concluded that it was proper for the prosecution to cross-examine defendant "concerning this 'pertinent' trait of character," and the Court held that the trial court did not err in allowing

**STATE v. DENNISON**

[163 N.C. App. 375 (2004)]

the prosecution to elicit details of the defendant's prior assault convictions. *Id.* at 290, 410 S.E.2d at 870.

As the Court noted in *Garner*, these holdings are "consistent with two other well-established principles of law." 33 N.C. at 290, 410 S.E.2d at 870. In *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981), a pre-Rules case, the Court stated:

> [T]he law wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself. Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially.

(citations omitted). In *State v. Warren*, 327 N.C. 364, 373, 395 S.E.2d 116, 121-22 (1990), the Court stated:

> Generally, much latitude is given counsel on cross-examination to test matters related by a witness on direct examination. The scope of cross-examination is subject to two limitations: (1) the discretion of the trial court; and (2) the questions offered must be asked in good faith. Furthermore, the questions of the State on cross-examination are deemed proper unless the record discloses that the questions were asked in bad faith.

(citations omitted).

Therefore, where a defendant in a murder case presents evidence that he is peaceful or has a nonviolent disposition, that evidence goes to a "pertinent trait" of his character. The door is thus deemed "open" to the prosecution, which may introduce its own character evidence on cross to rebut the defendant's evidence.

In the case *sub judice*, defendant's witnesses "painted [him] as calm, level-headed, and doing everything he could to avoid a confrontation, reacting to [the victim's] provocations with logic and a lack of concern." Defendant also presented evidence that he "don't like this stuff," and that he is "not into [fighting]." Therefore, defendant introduced evidence concerning a "pertinent trait" of his character and thus opened the door for rebuttal by the prosecution.

Nevertheless, the majority argues that the evidence was strictly limited to the state of mind of defendant *"on the night in question."*

(emphasis in original). However, our Supreme Court has allowed the prosecution to rebut a favorable inference established by a defendant on direct with specific evidence of its own during cross-examination. *State v. Bullard*, 312 N.C. 129, 157-58, 322 S.E.2d 370, 386 (1984). In the case *sub judice*, even if defendant's witnesses were asked only about defendant's character on the evening of the murder, the impression these questions created in the minds of the jury is not so limited. Instead, the clear inference from the testimony is that defendant possesses a peaceful character. Furthermore, even if the majority's argument is accepted, "[t]he admission of relevant evidence is left to the sound discretion of the trial court." *State v. Hall*, 134 N.C. App. 417, 427, 517 S.E.2d 907, 914 (1999), *disc. review denied*, 351 N.C. 364, 542 S.E.2d 647 (2000), *cert. denied*, 531 U.S. 1085 (2001). Additionally, a trial court's evidentiary ruling should be overturned "only upon a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision." *Id.* (citation omitted).

Considering the discretion granted to the trial court in ruling on evidentiary issues, in the case *sub judice*, the trial court's decision to allow the prosecution to cross-examine defendant with specific bad acts and elicit testimony from defendant's former girlfriend was correct. The ruling was not "so arbitrary it could not have been the result of a reasoned decision." *Id.* Given the testimony of defendant's witnesses and the logical inferences created therein, the trial court was reasonable in believing that defendant was attempting to paint himself as a peaceful and nonviolent individual—a pertinent character trait in a murder trial with self-defense undertones. Therefore, the defendant opened the door to cross-examination and rebuttal by the prosecution, and the trial court did not err in allowing the prosecution to rebut defendant's evidence with specific bad act evidence of its own.

Accordingly, I dissent from the majority opinion.